NOT DESIGNATED FOR PUBLICATION

No. 118,199

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JASON TODD ROSS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed February 22, 2019. Affirmed.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., MALONE and LEBEN, JJ.


PER CURIAM:  A jury convicted Jason Todd Ross of three counts of aggravated kidnapping, three counts of aggravated robbery, one count of aggravated burglary, and two counts of aggravated battery. The district court sentenced him to 452 months' imprisonment. In this direct appeal, Ross argues (1) the district court erred by allowing certain testimony at trial; (2) insufficient evidence supported his convictions; (3) jury instructions given were erroneous; (4) the district court erred by denying his motion for mistrial; (5) his aggravated robbery convictions are multiplicitous; (6) prosecutorial error violated his constitutional right to a fair trial; (7) the district court erred by admitting

1

certain evidentiary exhibits; (8) the district court erred by allowing the State to endorse a witness for trial at a late date; (9) the district court erred by failing to give a unanimity jury instruction; and (10) cumulative error denied Ross a fair trial. Finding no reversible error, either independently or collectively, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2016, 18-year-old Cameron Johnson lived in a duplex with his older brother, Jarrod Johnson, known as Jaye, and their roommate, Jessica Holdt. The ground floor included Cameron's bedroom, Holdt's bedroom, a living room, and the kitchen; Jaye's bedroom was in the basement, along with a second living room and a bathroom.

On April 30, 2016, Jaye went out with his girlfriend, R.C., to watch her sing with a band. After her performance, R.C. and Jaye returned to the duplex. Although R.C. later testified that no one else came to the duplex until the later break-in, Jaye and Ross both testified that Ross, Jade McDowell, and Jordan Bell came over that night to buy some marijuana. Jaye knew McDowell and Ross from previous interactions. Ross later testified that when he went to the duplex, he was wearing "brown and black leopard print LeBron Nike shoes," a white t-shirt, sweatpants, and a black beanie. Jaye, McDowell, Ross, and Bell smoked marijuana together. Ross later testified that he coughed so much from the marijuana smoke that he wiped his mouth off on a towel he found on Jaye's bed. After less than 30 minutes, McDowell, Ross, and Bell left. Ross later testified that he spent the rest of the night at his home with a friend, S.M.

After McDowell, Ross, and Bell left, Jaye and R.C. went out to get food, leaving Cameron at home alone watching television in his bedroom. Holdt was out of town. When Jaye and R.C. returned, they went down to the basement. The following events as described by Jaye, R.C., and Cameron differ slightly, so each version is related below.

2

*Jaye's recollection of the break-in*

Jaye was getting ready to turn on Netflix when he heard the front door open. When he looked up the stairs, he saw two men coming down with guns; one of the men, whom Jaye later identified as Bell, pulled Jaye off the couch and put a gun in his face. The men were wearing "various types of masks" and latex gloves, but Jaye could see Bell's eyes. While struggling with Bell, Jaye was hit in the back of the head with a gun. Jaye stopped resisting and was lying face down on the floor near the stairs, when a third man, also armed with a gun, brought Cameron down the stairs. The third man wore a "Jason-style hockey mask." Jaye was instructed to remove all of his clothing and continue to lie face down on the floor, which he did because he was afraid and the men had already threatened to kill him. Jaye also heard the men threaten to kill Cameron and threaten to drug R.C., sexually assault her, and strand her somewhere. The men repeatedly asked for guns, money, and drugs, and when Jaye denied having any of those items, the men stomped on him and hit him with their guns.

Bell forced Jaye, who was still nude, into his bedroom, again asking "where everything was"; when Jaye denied having anything, Bell hit him again with the gun, knocking Jaye into his closet. Bell kicked Jaye, then pulled him up and moved him into the bathroom. After making Jaye take everything out of the drawers and cabinets, Bell ordered Jaye into the shower, turned on the water, and yelled for someone to turn the music on. Bell told Jaye he was about to kill him, he was going to shoot Jaye in the knee, and he was "going to shoot [Jaye's] dick off." Bell then closed the shower door, leaned a bottle of lotion against it so that it would fall if the door was opened, and told Jaye that if he moved, Bell would come back and kill him.

Bell left the bathroom, but he returned after several minutes and took Jaye back into the basement living room. Bell told Jaye to look down the barrel of his gun and asked Jaye if he could see the bullet; Jaye said yes. Bell asked again where the money

3

was and, when Jaye denied having any more money, Bell struck him and knocked him into the wall and down to the floor. Bell retrieved a screwdriver from a table and threatened to "shove that up [Jaye's] ass." When Jaye continued to deny having money other than what was in his wallet, one of the other men walked over. This man had taken off his mask—Jaye later identified him as Ross—and he said, "[D]o you know me, it's Lucky." When Jaye continued to deny having more money, Ross stomped on Jaye's head "six or seven times."

Ross—and maybe Bell—piled a bunch of items, such as an end table, a laundry basket, and clothes, on top of Jaye; Jaye believed this was so they would hear if he tried to move. The men told Jaye that if he moved, called the police, or came outside the duplex, they would kill him. Ross went up the stairs and, shortly thereafter, Bell took R.C. upstairs. Jaye heard Ross yell, "[W]e gotta go," and a few minutes later, R.C. came downstairs and told Jaye and Cameron to get up. Jaye realized that his phone, which had been on a table in the basement, was gone, as were his keys. So Jaye put on shorts, shoes, and a coat and walked next door, where his neighbor called the police.

*Cameron's recollection of the break-in*

Cameron testified that at about 1:30 a.m. on May 1, 2016, he heard Jaye and R.C. return to the duplex. Ten to twenty minutes later, he heard a crash and a black man wearing a white plastic face mask walked into his bedroom. The man pressed a gun to Cameron's forehead hard enough to draw blood and threatened to kill him. At the man's direction, Cameron loaded his belongings, including his video games and gaming console into various bags that were already in the room, including Cameron's own book bag.

The man took Cameron downstairs at gunpoint, where Cameron saw R.C. sitting in front of the couch and Jaye lying in a pool of blood on the floor at the base of the stairs with two men with guns standing over him, one of whom was holding a gun to Jaye's

4

head and wearing a mask like the man who had come into Cameron's bedroom. The man who had brought Cameron downstairs told him to lie facedown on the floor beside Jaye and not move. The men repeatedly told Cameron that they were going to kill them, and Cameron believed he was going to die.

Although Cameron mostly kept his head down, he heard the men ask Jaye for money, drugs, and guns. He could also hear "punches landing and pistol whipping." Cameron testified that this lasted between 30 and 45 minutes. He did look up twice. The first time, he saw the room was "trashed" and there were three men walking around and "standing over" R.C. The second time he looked up, one of the men kicked him in the mouth, stomped on the back of his head, and hit him with a lamp. Cameron also heard the men tell Jaye to get up and move, and Jaye got up and went out of the basement living room and into a back room. Cameron testified that Jaye was dressed at that time.

According to Cameron, the men later told Cameron, Jaye, and R.C. to take off all their clothes. Believing they would beat him if he did not cooperate, Cameron did so. He heard one of the men take R.C. out of the basement and say he was going to "take her with," which Cameron thought meant they would kidnap her. Cameron continued to lie naked on the floor, and one of the men placed a glass tabletop and a curtain on top of his body and told him not to move or he would shoot him with a gun he was pointing at Cameron's head.

Cameron could hear his brother being beaten, and he believed if he tried to help Jaye or R.C., the men would shoot him. The men said that they would kill them if anyone called the police and that there was someone waiting outside who would shoot them if they tried to leave the duplex. The men left shortly thereafter, without Cameron ever seeing any of their faces.

5

*R.C.'s recollection of the break-in*

R.C. testified that she and Jaye returned to his home early in the morning of May 1, 2016, and they went into the basement. R.C. sat on the couch with a blanket Jaye had given her, and Jaye was about to start a movie on the television when they heard the door open. Jaye called out, believing Holdt had come home, but no one answered and two men R.C. did not know—but whom she later identified as Ross and Bell—came down into the basement. Ross came over and took R.C.'s phone out of her hand and also took her keys, which were located nearby. R.C. testified that Ross was not wearing a mask, so she saw his face. Jaye fought with Bell and Bell repeatedly yelled about money and about killing them. Although R.C. covered her head with the blanket "[f]or a good majority of what was going on," so she did not see everything that happened, she heard everything, including the men asking for money and one of them saying to turn the music up.

At some point, R.C. moved or was moved to the floor, still covered with the blanket. R.C. heard Bell "mak[e] mention of the Carr brothers," which she believed meant that she was about to be raped and killed. After approximately 10 minutes, Bell twice asked R.C. if she "knew where money was at." Each time, when she said no, he punched her in the face near her right eye. Then Bell told R.C., Jaye, and Cameron to remove their clothes, which they did.

Bell told R.C. to go upstairs. "He basically said that he was going to rape me and that he was going to take me out into a field far away and he was going to leave me there." Bell followed R.C. up the stairs and told her that she had a "nice ass." Once in the kitchen, R.C. backed into a table, facing Bell, who was pointing a gun at her. Bell reached out and rubbed her clitoris with his hand, inserting his finger past her labia.

Although Bell was wearing a mask, R.C. could see his eyes and his lips, and she could tell that he was biracial. He told her to turn around, and when she asked why, he

6

said, "[S]o I can take you," which R.C. understood to mean that he was going to rape her. When she refused to turn around, Bell looked confused and told her to pick up a plastic bag. R.C. asked which plastic bag, but at that point a man ran up the stairs and said, "[C]ome on, we have to go." R.C. also saw another individual standing by the front door.

Before the men left, they told R.C. that someone was outside watching and if they called the police that person would kill them. About 5 to 10 minutes after the men left, R.C. went downstairs and told Jaye and Cameron that the men were gone. All three got dressed and the next thing R.C. remembered, the police were there.

*Neighbors' involvement*

While these events were happening, Shaunna Taylor was watching movies with her friend, Aisha Zowasky, in Taylor's home in the other half of the duplex where Jaye and Cameron lived. After they went to bed, Zowasky, who was sleeping in the living room, heard someone trying to come in Taylor's front door. When the locked door did not open, the person outside "hopped over to the next porch," and Zowasky woke Taylor.

Through her living room windows, Taylor saw someone run past toward the other half of the duplex. Taylor and Zowasky also saw what looked like an individual carrying items, boxes, and perhaps a backpack out of her neighbors' home to a truck parked down the street. While the individual was inside the other half of the duplex, Taylor and Zowasky heard a male voice yelling the word "homie" argumentatively.

Thinking there was a family dispute between Jaye and Cameron, Taylor called and texted Holdt about the noise. Holdt told Taylor that she was out of town, but she would call Jaye to find out what was happening. Holdt later texted Taylor that Jaye and Cameron were not answering their phones.

Taylor saw a red car pull up in front of the duplex and an individual began carrying things from the duplex out to the car. When Taylor saw a man run through her backyard, she and Zowasky went outside, and Taylor asked the people standing by the red car if they had been in her backyard. One of the individuals, whom Taylor and Zowasky both identified at trial as Ross, initially denied having been in the backyard, and he walked over to Taylor. Ross stood between "an arm's length" and 5 feet away from Taylor and Zowasky, facing them, with nothing covering his face. Ross said that he and his girlfriend had argued and she threatened to burn his belongings, so he had put some items in Taylor's backyard. Ross offered to show Taylor the items, retrieving two wooden dresser drawers full of clothes from inside the gate to Taylor's backyard. Taylor did not look closely at the clothes; instead, after talking with Ross, she smoked a cigarette, saw the red car drive away, and went back inside her home.

Shortly after Taylor and Zowasky went back inside, however, the doorbell rang. The person ringing the doorbell identified himself as Taylor's neighbor, but Taylor had difficulty recognizing Jaye because his face and head were "very bloody and swollen." Taylor called 911 and requested medical and police assistance.

*Police investigation and identification of suspects*

At about 4 a.m., Officer Jason Lane and Officer Clayton Van Daley of the Wichita Police Department were dispatched to Jaye and Cameron's home. When they arrived, Lane went to Taylor's home and talked with her, while Van Daley went to the other half of the duplex and interviewed Cameron about the events of the evening. Jaye was taken to the hospital by ambulance, and he received between six and eight staples in the back of his head, four to five staples on top of his head, six stitches across his nose, and two to three stitches by his ear. Jaye later testified that he lost memory of the two- to three-week period prior to the assault and he suffered lasting physical scars. Meanwhile, Lane spoke by telephone with Holdt, who said that there had been a personal firearm in a small safe

8

in her bedroom; Lane looked in Holdt's bedroom but saw neither the safe nor the firearm. Around the same time, Wichita Police Officer David Riddel conducted an interview with R.C. After her interview, police took R.C. to the hospital to be with Jaye.

At about 6:45 a.m., police contacted Holdt and informed her that her home had been robbed and Jaye was in the hospital. Holdt immediately drove home, where she discovered that the safe containing her revolver, passport, Social Security card, and money had been taken from her bedroom. Also missing from Holdt's room was jewelry, a video camera, a memory card, purses, bags, shoes, and an ottoman.

At the hospital, Jaye gave a statement to Officer Taylor Powers of the Wichita Police Department, who also photographed Jaye's injuries. At about 10 or 11 a.m. on May 1, 2016, Jaye called his friend, Isaias Ramirez, to pick them up at the hospital. When he arrived at the hospital, Ramirez did not recognize Jaye at first because his injuries were so severe; Ramirez described Jaye's face as "look[ing] like someone just smashed him like a pumpkin."

Jaye began telling Ramirez what had happened, and he described one of his assailants as a light-skinned black male, tall and skinny, nicknamed Lucky. Ramirez thought of Ross, with whom Ramirez had gone to middle school and who fit that description. Ross and Ramirez were friends on Facebook, so Ramirez pulled up a picture of Ross on the Facebook profile for "Jason Luckydacurse Ross" and showed it to Jaye. As soon as he saw the picture, Jaye realized that Ross was one of his assailants. In other photographs on Ross' Facebook page that were posted after the intrusion into the duplex, Jaye saw what he believed was a pair of his shoes and one of his sweatshirts and he recognized Bell as another of his assailants. R.C. looked at the Facebook pictures as well, and she identified Ross as the man who had taken her phone and keys. She further identified Bell as the man who had sexually assaulted her, and she saw what she believed was Ross wearing a pair of shoes that belonged to Jaye.

9

R.C., Jaye, and Ramirez returned to the duplex where, while cleaning up the basement, Jaye noticed a beanie on the floor that looked like a beanie Ross was wearing in one of the pictures on Facebook. Jaye also found a gray short-sleeved t-shirt in the basement that was not his. Jaye called the police, and about 11:45 a.m., Officer Ronald Sanders returned to the duplex and collected the beanie and the t-shirt. While there, Sanders also learned that there were smudges on a bed and the kitchen door that might be fingerprints, and Jaye told Sanders that they had found a Facebook photograph of the intruders. As a result, Sanders called police lab technicians back to the duplex and Jaye, Cameron, and R.C. were taken back to the police station for additional interviews.

Around 4 p.m., Detective William Crowe interviewed Cameron and took DNA from him. Detective Faustino Naldoza took DNA from Jaye and showed two photographic lineups to him; Jaye picked Ross out of one lineup and Bell out of the other. Similarly, R.C. identified Ross and Bell in photographic lineups administered by Detective Paul Herman. Herman interviewed R.C. about the events of the prior night, and he also obtained DNA from her. R.C. then went to a hospital and underwent a rape examination, during which she again named Bell as her assailant.

Wichita police arrested Ross on May 14, 2016. Jaye later identified as his own stolen property the brown leopard print Nike shoes and the Polo wallet retrieved from Ross' person upon his arrest.

*Criminal prosecution*

On May 17, 2016, the State charged Ross with one count of aggravated kidnapping of Jaye; one count of aggravated kidnapping of R.C.; one count of aggravated kidnapping of Cameron; one count of aggravated robbery of Jaye; one count of aggravated robbery of Cameron; one count of aggravated robbery of R.C.; one count of aggravated burglary; one count of aggravated battery of Cameron; and one count of

10

aggravated battery of Jaye. The State prosecuted Ross on all counts as both a principal and an aider and abettor.

A week-long jury trial began on April 3, 2017. The State presented testimony from Taylor, Zowasky, R.C., Jaye, Cameron, Ramirez, and Holdt, as well as 12 law enforcement officers involved in the investigation of the crimes and the arrest of Ross. The State also admitted more than 173 exhibits into evidence, including the photographic lineups from which Taylor identified Ross and from which Jaye and R.C. identified Bell and Ross; photographs of the injuries suffered by Cameron, R.C., and Jaye; a diagram showing the location of the injuries to R.C.'s face; a diagram of the anatomical structure of female genitalia; and photographs of the crime scenes. Of particular significance in this appeal, the district court admitted State's Exhibit 39, which was one of the photographs on Facebook from which R.C. and Jaye identified Ross and Bell; it is a photograph of Ross, Bell, and a third man, later identified as Ross' friend, Niko.

The law enforcement testimony was largely to establish the facts already detailed above. In addition, however, Detective Faustino Naldoza testified that inmates of the Sedgwick County Detention Facility were allowed to make 20-minute phone calls, which are recorded, and a warning is given at the very beginning of each phone call that the call is being recorded. The State played for the jury State's Exhibit 83, a redacted recording of a phone call Ross made from the Sedgwick County Detention Facility to Bria Russell on May 21, 2016. Naldoza testified that the call had been made under another inmate's PIN number, a practice Naldoza stated an inmate might engage in if "he knows his phone calls are being listened to." During the recording, Ross instructs Russell on what to say if she testifies, and he reiterates that Russell, McDowell, and another individual named Niko needed to get their stories straight.

Registered nurse Tracy Hess, who performed R.C.'s sexual assault examination, testified for the State. Sarah Goering, DNA analyst at the Sedgwick County Regional

11

Forensic Science Center, also testified for the State. Goering compared the gray short-sleeve t-shirt and the black beanie taken from the duplex to the known samples. Testing of the swabbing from the interior neckline of the shirt showed a profile of at least four individual contributors; it excluded R.C. and Bell but could not exclude Ross, Jaye, and Cameron. Samples from an exterior stain just below the logo of the t-shirt and from the interior back lower edge of the t-shirt were consistent with Jaye's DNA profile, but Ross, Cameron, R.C., and Bell were excluded as contributors.

Regarding the beanie, Goering testified that she collected two swabs, one from the interior front of the beanie and one from the very edge of the folded portion of the beanie. She was able to extract DNA from the samples, but only a partial profile. The partial DNA profile was a mixture from at least three individuals; Ross could not be excluded as a major contributor to the partial profile, but Jaye, Cameron, R.C., and Bell were excluded as contributors. Goering also testified that "the probability of selecting an unrelated individual at random who exhibits a profile that is a potential major contributor to the swabbing from the stocking cap interior front is approximately one in 516,000."

Ross testified in his own defense. He admitted that he had been to the duplex on the night in question, but he said he was there with McDowell and Bell to buy drugs and that after doing so and smoking marijuana, he had stayed home the rest of the night. Ross also testified that a few days later, he realized he had left his beanie at the duplex and he texted Jaye to see if he could retrieve it, but he got no response. Ross asserted that he had purchased the shoes that Jaye identified on Facebook as his own in mid-April in Dallas, Texas. He also testified that the shoes and the wallet that he had on him at the time of his arrest belonged to him and had not been taken from Jaye. During his direct examination, Ross admitted that he had called Russell from jail in an attempt to create a false alibi for the night of the crimes, but he claimed that he had done so out of fear and because he had "never been in a situation like that before."

12

On cross-examination, the State questioned Ross about his phone calls, which Ross admitted he had made under other inmates' PIN numbers to attempt to hide who he was calling. Ross admitted that he had asked Russell to falsify an alibi for him and to help other potential witnesses get their stories straight, but he maintained he asked Russell for a false alibi because he could not reach Marshall, with whom he had actually been at the time of the crimes. Ross also admitted: (1) he had asked Niko to falsify an alibi for him and to ask a woman named Kelsey to do the same; (2) he asked McDowell and another friend, Anthony, to testify falsely on his behalf; (3) he asked his mother to find someone to say that Taylor was being paid to falsely identify him; (4) he had called Dominique Shugart to attempt a three-way phone call with Anthony to further a story that Taylor was a habitual liar; and (5) in another phone call to his mother, he referred to clothing taken from the residence on the night of the robberies and asked his mother to tell his brother to say that they had purchased the clothing together in Dallas.

As a rebuttal witness, the State called Captain Jared Schechter with the Sedgwick County sheriff's office, who was the support commander for the jail and who explained the process for searching the phone system for a specific inmate's phone calls. The State also called Naldoza as a rebuttal witness. Naldoza testified that while in custody, Ross had made phone calls to his mother and to Shugart; excerpts of those calls were admitted and published with no objection. Each phone call included statements by Ross attempting to line up an alibi for the time in question and making sure everyone was on the same page. In another call, he gave Taylor's name, birthdate, phone number, race, and address and asked people to spread the word that Taylor is a habitual liar. In yet another call, he gave Jaye's name, phone number, age, and physical description to relay to Anthony.

After receiving jury instructions and hearing closing argument, the jury found Ross guilty on all counts: three counts of aggravated kidnapping, three counts of aggravated robbery, one count of aggravated burglary, and two counts of aggravated battery. Ross filed motions for a new trial and for judgment of acquittal, which the

13

district court denied. At the sentencing hearing, the district court denied Ross' motion for departure and sentenced him to a controlling term of 452 months' imprisonment. Ross timely appealed.

Ross has identified 13 issues on appeal. We have consolidated some of the issues and reordered the issues in this opinion.

## DID THE DISTRICT COURT ERR BY ALLOWING THE STATE TO ENDORSE ZOWASKY AS A WITNESS?

At a hearing on March 31, 2017, which was the Friday before the Monday on which the trial was scheduled to begin, Ross moved for closure of discovery. In response, the prosecutor stated that earlier that day she had met with Taylor and realized that Zowasky, who had been at Taylor's home on the night in question, had not been subpoenaed. The prosecutor informed the district court that she did not have a record showing that Zowasky had been interviewed by law enforcement, but she did note that the incident report, which the defense had received in "the beginning," identified Zowasky as a witness and gave her full name, birthdate, address, and other identifying information. The State also asserted that Zowasky was named in Van Daley's report and that the defense had Taylor's information as well. The prosecutor then asked "to endorse [Zowasky] as not [*sic*] a surprise witness."

Ross objected, characterizing Zowasky as a surprise witness. The district court granted the motion, stating: "I am going to find that she's not a surprise. Apparently she was on documentation that both parties had. I understand the documents here are voluminous, so I get that, but her name was listed twice. So I'm going to allow that." Ross contends that the district court erred by allowing this late endorsement.

14

K.S.A. 22-3201(g) states:

"Except as otherwise provided, the prosecuting attorney shall endorse the names of all witnesses known to the prosecuting attorney upon the complaint, information and indictment at the time of filing it. Except as otherwise provided, the prosecuting attorney may endorse on it the names of other witnesses that may afterward become known to the prosecuting attorney, at times that the court may by rule or otherwise prescribe."

The Kansas Supreme Court has long "construed the language found in the first two sentences of K.S.A. [] 22-3201(g) as conferring 'broad discretionary power on the trial court in allowing a late endorsement.'" *State v. Martens*, 274 Kan. 459, 471, 54 P.3d 960 (2002) (quoting *State v. Green*, 252 Kan. 548, 553, 847 P.2d 1208 [1993]). "'An appellate court will generally uphold a late endorsement unless the defendant was surprised and the testimony was critical or, in other words, of "a climactic and highly damaging nature."'" *State v. Shelby*, 277 Kan. 668, 674, 89 P.3d 558 (2004).

Ross argues that Zowasky gave "critical" testimony because she corroborated Taylor's identification of Ross as one of the robbers. Ross asserts that Zowasky was the only witness who testified that one of the perpetrators was a white male, which Ross generally asserts impacted the effect of State's Exhibit 39, the photograph of Ross, Bell, and Niko, a white male.

While Zowasky's identification of Ross may have strengthened the State's case, it was not the sort of highly damaging, surprising, critical testimony that renders the district court's decision to allow the late endorsement erroneous. Zowasky was identified by name as a witness to relevant events in documents provided to the defense in discovery early on in the case. Her testimony largely mirrored and corroborated Taylor's, and the defense had ample time to prepare for Taylor's testimony. Thus, the district court did not abuse its discretion in allowing the State to endorse Zowasky just before trial.

15

Even assuming that the district court erred in allowing the late endorsement of Zowasky as a witness for the State, that error does not independently require reversal. In order "[t]o show reversible error on appeal, the defendant must have objected to the late endorsement, requested a continuance, and been denied that continuance." *State v. Brosseit*, 308 Kan. 743, 749, 423 P.3d 1036 (2018). Here, Ross did not request a continuance based on the late endorsement; thus, any error in the endorsement does not require reversal of Ross' convictions.

DID THE DISTRICT COURT ERR BY ALLOWING CERTAIN TESTIMONY OF HESS?

Ross argues that the district court erroneously allowed Hess to testify that R.C. was raped, a legal conclusion which should have been exclusively left in the province of the jury. Hess was the SANE nurse who performed R.C.'s sexual assault examination. Ross contends that this error resulted in the denial of a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. The State first asserts that Ross' appellate argument is not preserved for review. On the merits, the State argues that the district court did not err in allowing Hess' testimony.

Hess testified that, during the examination of R.C., she found a 0.3 cm abrasion on the posterior fourchette. The prosecutor then attempted to introduce State's Exhibit 27, a diagram generally showing the anatomy of the female genitalia, and Ross objected based on insufficient foundation. The district court asked the prosecutor to lay some foundation, which included the following colloquy:

"Q. And does it [State's 27] help explain to the jury that her female genitalia would be penetrated if someone were to touch her clitoris?
"A. Yes.
"Q. Is that helpful in explaining—are you aware as a SANE nurse of the legal definition of rape or sexual intercourse?
"A. Yes.

16

"Q. And is that helpful to the jury to see the female genitalia to explain penetration?

"A. Yes."

The prosecutor again offered State's Exhibit 27 and Ross also objected based on relevance. The district court overruled Ross' objections and admitted the exhibit. The colloquy then continued between the prosecutor and Hess without any objection:

"Q. So in order to get to the clitoral hood, which is also known as what?

"A. The clitoris, clitoral hood.

"Q. Would you have to penetrate both the labia majora and the labia minora or just the labia majora?

"A. You'd have to penetrate the labia majora, but I think it depends on the anatomy of the person too. Everybody's anatomy is different.

"Q. And that would be inside the female genitalia?

"A. Correct.

"Q. All right. So your patient told you that he, her perpetrator, had touched her clitoris?

"A. Correct.

"Q. *All right. In order to do that would he have to had to penetrate her genitalia?*

"A. *Yes.*" (Emphasis added.)

Ross argues that "Hess' testimony that R.C. was penetrated was based upon the legal definition of rape and sexual intercourse. Her testimony constituted a legal conclusion under the guise of an expert opinion."

A multistep analysis applies when a district court determines the admissibility of evidence. These steps require a court to (1) examine the relevance, (2) consider the application of any applicable rules of evidence, and (3) weigh the probative value of the evidence against any prejudice. *State v. Knox*, 301 Kan. 671, 688, 347 P.3d 656 (2015).

17

Ross contends that his constitutional right to a fair trial was violated "when the district court allowed [Hess] to give a legal conclusion that R.C. was raped." He generally characterizes Hess' testimony, as "exceed[ing] the bounds of proper expert testimony, invad[ing] the province of the jury[,] and usurp[ing] the court's exclusive authority to instruct the jury on the law."

The caselaw upon which Ross relies involves instances in which a witness directly testified whether certain facts supported a legal conclusion. For example, in *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011), the district court erred in allowing the emergency room doctor who examined the victim to testify "as to whether [the doctor's] physical finding [from the examination] did or did not mean [the victim] had been raped." In *State v. Bressman*, 236 Kan. 296, 302-03, 689 P.2d 901 (1984), on which the *Tully* court relied, the district court erred by allowing the examining doctor to testify that "'I believe [the victim] was raped.'"

First, we agree with the State that Ross' appellate argument is not preserved for review. "'Generally, to preserve an evidentiary issue for appellate review, the complaining party must have lodged a timely and specific objection at trial.' . . . This court does not allow parties 'to object to the introduction of evidence on one ground at trial and then assert another ground on appeal.'" *State v. Robinson*, 306 Kan. 1012, 1028-29, 399 P.3d 194 (2017). Although Ross initially objected to the introduction of State's Exhibit 27 based on insufficient foundation and relevance, he did not object when Hess made the statements he now points to as improper testimony, nor did he ever object to Hess' testimony on the grounds that it constituted an improper legal opinion or conclusion. On very similar facts, this court found that an appellate argument that testimony constituted an improper opinion that should have been left to the jury was not properly before this court. See *State v. Diaz*, No. 100,735, 2010 WL 481258, at *3 (Kan. App. 2010) (unpublished opinion) (finding that a claim that expert testimony was

18

improper because it improperly invaded the province of the jury was not properly before this court because at trial the appellant objected to the testimony as speculative).

Assuming for the sake of argument that the issue is preserved for appeal, we must consider whether the district court erred in admitting Hess' testimony and, if so, whether any error was harmless. Without deciding whether the district court erred in admitting the testimony, we will go directly to the question of harmless error.

The erroneous admission of evidence is subject to review for harmless error under K.S.A. 2017 Supp. 60-261. But if the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard: whether the party benefiting from the error proves beyond a reasonable doubt that the error would not or did not affect the outcome of the trial in light of the entire record. *State v. Santos-Vega*, 299 Kan. 11, 24, 321 P.3d 1 (2014).

Unlike in *Tully* and *Bressman* where the prosecutor asked a medical examiner to state a conclusion whether the "victim had been raped," Hess only testified generally that if the perpetrator touched R.C.'s clitoris, he would "have had to penetrate her genitalia." This testimony, even if erroneously admitted, would have been harmless error for two reasons. First and foremost, Ross was not charged with rape. The charges against Ross that implicated rape—aggravated kidnapping of R.C. and aggravated burglary—did so in the sense that rape was an underlying intended act. Unlike a rape charge, which would require the State to prove penetration, all the State was required to prove was the *intent* to commit rape. See K.S.A. 2017 Supp. 21-5503 (listing "sexual intercourse" as an element of rape); K.S.A. 2017 Supp. 21-5501(a) (defining "sexual intercourse" as "penetration of the female sex organ"). Finding that Ross committed his actions with the intent to commit rape did not require a finding that penetration actually occurred.

19

Second, R.C. herself testified that penetration occurred. When asked whether her assailant's fingers "penetrate[d her] genitalia," R.C. testified, "Yes." When asked, "[H]e was able to penetrate your labia enough to rub your clitoris?" R.C. testified, "Yes." Therefore, Hess' testimony was, at worst, cumulative of other evidence properly admitted to the jury and, as such, we conclude beyond a reasonable doubt that the portions of Hess' testimony Ross now challenges did not affect the jury's verdict.

DID THE DISTRICT COURT ERR BY ADMITTING STATE'S EXHIBIT 39 INTO EVIDENCE?

State's Exhibit 39 is a photograph showing three individuals: Ross is closest to the camera, making a gesture with his left hand; Bell is behind Ross; and an individual identified as Niko is behind Bell, giving the middle finger to the camera with both hands. Ross contends that the photograph shows him "flashing a gang sign," while the State argues that there was no evidence that the hand gesture Ross is making in the photograph was gang related. The standard of reviewing the district court's decision on the admissibility of evidence is set forth in the last issue. See *Knox*, 301 Kan. at 688.

At trial, when the State wanted to introduce Exhibit 39 into evidence, the parties argued its admission on the record out of the hearing of the jury. The State argued that the photograph was probative because it showed Ross wearing the beanie the State alleged he left behind at the duplex while committing the crimes on the night in question. The State informed the district court that it could not crop Ross' hand out of the picture "while preserving the integrity of the rest of the picture." But the State advised the district court that it did not intend to present any testimony as to whether Ross' hand gesture in the photograph was a gang sign. The State contended that the picture's probative value far outweighed any prejudice that might be caused by the hand sign, especially with no one drawing special attention to it. For his part, Ross contended at trial that the prejudicial effect was "obvious. Gang signs, gangbanger must have committed this crime."

20

The district court admitted State's Exhibit 39 into evidence, stating "to be clear, this is not a gang evidence issue per se." The district court later stated: "Ultimately, I'm going to allow it in. I don't think it could be cropped very easily . . . . ID is the issue. I'll refer to my prior ID ruling and that PIK instruction." The record shows that the district court instructed the jury on eyewitness identification at the request of both parties.

We conclude the district court did not err by admitting State's Exhibit 39 into evidence. The photograph was extremely relevant as to identification because it showed Ross wearing a beanie hat later found at the residence where the crime spree occurred. Although State's Exhibit 39 shows Ross making a hand gesture, there was no evidence presented at trial that the hand gesture was, in fact, a gang sign, nor was there evidence presented that Ross was in any way affiliated with a gang. The probative value of the photograph outweighed any potential prejudice, and the district court did not err by admitting State's Exhibit 39 into evidence.

DID THE DISTRICT COURT ERR BY DENYING ROSS' MOTION FOR MISTRIAL?

Although Ross includes this issue in his broader claim of prosecutorial error addressed later in this opinion, the question of whether to grant a motion for mistrial is the district court's decision, not prosecutorial error. Thus, we will address the propriety of the district court's decision denying Ross' motion for mistrial as an issue separate from that of prosecutorial error.

At the pretrial motions hearing, the district court granted Ross' motion for sequestration of all witnesses. During the trial, immediately after Ross testified, the district court informed the jury that the court was about to break for lunch. While the district court was admonishing the jury, the prosecutor interrupted: "[Prosecutor]: Judge, I want to object right now because two people in the courtroom are texting and—THE COURT: Okay. Hold on. Hold on. All right."

21

The court finished admonishing the jury and released it for lunch. After the jury had exited the courtroom, the prosecutor explained her concern that individuals in the courtroom were violating the witness sequestration order by texting information to defense witnesses. The prosecutor admitted that the texting that led to her objection could be "innocent conduct" but also noted that the individuals merely watching the trial had not been instructed not to contact witnesses. The prosecutor suggested that people in the gallery may be texting defense witnesses in violation of the sequestration order.

The State asked the district court to instruct individuals in the courtroom not to further communicate with potential defense witnesses. The State also expressed its amenability to a limiting instruction if the defense believed the objection by the State had prejudiced Ross in any way. In response, Ross moved for a mistrial, arguing that the State's "outburst" implied that Ross' family was texting information to defense witnesses and thereby destroyed "what little credibility" those witnesses might have had. The State replied that a mistrial was unwarranted and a curative jury instruction would remedy any potential impact the objection had on the jury.

The district court denied the motion for mistrial and found that any prejudice caused by the State's objection could be addressed with a curative instruction to the jury. The district court asked the parties to confer on an appropriate instruction or admonition to the jury. Ross suggested that "the best way to draw the least attention to it is for the Court simply to remind the jury, as suggested by the State, that people within the courtroom are not allowed to use their phones and so it's just a reminder." When the jury returned to the courtroom, the district court stated: "There was an objection made by [the State] as jurors were filing out of court prior to lunch. . . . The Court reminds everyone in the courtroom using electronic devices in the courtroom is prohibited."

Ross now contends that the district court erred by denying his motion for mistrial. The State disagrees.

"Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if prejudicial conduct inside or outside the courtroom makes it impossible for the trial to proceed without injustice to either party. The statute creates a two-step process. First, the district court must determine whether there was some fundamental failure of the proceeding. If there was, the district court moves to the second step and assesses whether it is possible to continue without injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial.

"Appellate courts review a district court's ruling on a motion for mistrial for an abuse of discretion. Judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable. The abuse of discretion inquiry is divided into two parts:  did the district court abuse its discretion when deciding whether there was a fundamental failure in the proceeding, and did the district court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? [Citations omitted.]" *State v. Barlett*, 308 Kan. 78, 88-89, 418 P.3d 1253 (2018).

Ross' entire argument is premised upon his overreaching assertion that the prosecutor's objection somehow "inferred the Defendant's family was violating the sequestration order, and texting trial information to defense witnesses." As the State pointed out to the district court, its only objection in the presence of the jury was that "two people in the courtroom are texting." The prosecutor did not suggest that people in the gallery could be texting defense witnesses until after the jury had left the courtroom. The State's objection that individuals in the courtroom were texting, even in front of the jury, does not, in and of itself, constitute a fundamental failure in the proceedings.

Moreover, the district court correctly found that any prejudice caused by the State's objection could be addressed with a curative instruction or admonition in the presence of the jury. When the jury returned to the courtroom after lunch, the district court admonished everyone in the gallery—without singling out anyone—that the use of electronic devices in the courtroom was prohibited. This admonition was essentially the

action that defense counsel requested the district court to take to cure any prejudice. As a result, the district court did not abuse its discretion in denying the motion for mistrial.

### DID THE DISTRICT COURT ERR BY GIVING JURY INSTRUCTION NOS. 5, 9, 10, 11, 13, 16, AND 18?

Ross argues, for various reasons, that the district court committed reversible error by giving Jury Instruction Nos. 5, 9, 10, 11, 13, 16, and 18. Jury Instruction No. 5 is the aiding and abetting instruction. Jury Instructions 9, 10, and 11 are the aggravated robbery elements instructions. Jury Instructions 13, 16, and 18 are the aggravated battery elements instructions.

Ross concedes that he did not object to the jury instructions at trial, but he contends that this court may still review the instructions for clear error, even in the absence of his objections. Ross is correct that when a defendant fails to object to a jury instruction, K.S.A. 2017 Supp. 22-3414(3) allows appellate courts to review such instructions to determine whether they were clearly erroneous. See *State v. Stewart*, 306 Kan. 237, 248, 393 P.3d 1031 (2017).

However, the State argues as a threshold matter that Ross actually invited any errors and thus is now precluded from challenging these jury instructions.

> "A defendant may not invite and lead a district court into error and then complain of the error on appeal. The invited error doctrine precludes a challenge to an instruction as clearly erroneous under K.S.A. 22-3413(3) when the district court gives a defendant's requested instruction to the jury. The doctrine can also apply where there has been an on-the-record agreement to the wording of the instruction at trial. [Citations omitted.]" *Stewart*, 306 Kan. at 248.

Ross argues that the invited error doctrine does not apply because he never submitted a proposed instruction on aiding and abetting similar to Jury Instruction No. 5

given by the district court. Likewise, Ross' proposed jury instructions on the elements of aggravated robbery and aggravated battery were not identical to the jury instructions given by the district court. However, as already stated above, the invited error doctrine may apply even where the instruction given is not the one originally proposed by the appealing party if there has been "an on-the-record agreement to the wording of the instruction at trial." *Stewart*, 306 Kan. at 248-49.

Here, the parties and the district court held an initial informal, off-the-record jury instruction conference. After the informal conference, the court made an extensive record of each jury instruction it intended to give, "allow[ing] each party to make any comments on their own instructions, any that they request, or additional objections."

As to Jury Instruction No. 5 on aiding and abetting, the district court stated that the instruction was from PIK Crim. 4th 52.140 and went on to note that the parties had discussed the language of the jury instruction and that the defense had requested certain language be included, to which the State did not object. The district court concluded, "That all being said, any objections and are the parties requesting instruction 5?" The State responded, "No objections and we're requesting it." Defense counsel then responded, "No objections, Judge. We are requesting it. We did request that language." Similarly, the district court addressed Jury Instruction Nos. 9, 10, 11, 13, 16, and 18, and with respect to each of these jury instructions, defense counsel affirmatively stated on the record that Ross did not object and, in fact, requested the instruction.

This is not a case where Ross simply failed to object at trial to the jury instructions he now challenges on appeal. Here, the district court held an extensive on-the-record jury instruction conference, and Ross affirmatively requested the language of each instruction he now attempts to challenge on appeal. Under these facts, and based on *Stewart*, we conclude the invited error doctrine prevents Ross from challenging Jury Instruction Nos. 5, 9, 10, 11, 13, 16, and 18 on appeal.

25

## DID THE DISTRICT COURT ERR BY FAILING TO GIVE A MULTIPLE ACTS JURY INSTRUCTION WITH RESPECT TO THE AGGRAVATED ROBBERY COUNTS?

Although the district court gave a multiple acts instruction regarding the aggravated kidnapping charges, Ross did not request and the district court did not give one regarding the three aggravated robbery counts. Ross now contends that this was clear error because there was evidence that multiple items were taken from Cameron, Jaye, and R.C., yet the district court did not instruct the jury that in order to return a guilty verdict, it needed to unanimously determine the items taken. The State disagrees, arguing that although the robberies involved multiple items from each victim, they were not multiple acts and therefore identity of the specific property taken is irrelevant.

Because Ross did not request a unanimity instruction on the aggravated robbery charges or object to the lack of such an instruction, this court reviews for clear error, "'i.e., the court will not disturb the conviction unless it is firmly convinced the jury would have reached a different verdict'" if the instruction had been given. See *State v. Lowery*, 308 Kan. 1183, 1216, 427 P.3d 865 (2018).

> "In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. In order to ensure jury unanimity as to the specific act for which the defendant is charged, the trial court must either require the State to elect the particular criminal act upon which it will rely for the conviction or instruct the jury that all jurors must agree that the same underlying criminal act has been proven beyond a reasonable doubt."
>
> "This court will apply a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine if the case truly involves multiple acts, *i.e.,* whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred, *i.e.,* whether there was a failure by the State to elect an act or a failure by the trial court to instruct. Third, the court must determine whether the error is reversible." *State v. Colston*, 290 Kan. 952, Syl. ¶¶ 1, 2, 235 P.3d 1234 (2010).

26

Under the multiple acts analysis, we must first determine if the case truly involves multiple acts. As stated above, Ross contends that this is a multiple acts case because the State alleged multiple items were taken from Jaye, Cameron, and R.C., and it did not inform the jury that, in order to convict Ross of aggravated robbery, it needed to be unanimous in its identification of the property taken from each of them.

> "'This court has determined that acts are multiple acts if they are factually separate and distinct. Further, '[i]ncidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by a "fresh impulse."' In addition, this court has identified other factors for determining if there is unitary conduct in a multiple acts case. These factors include: '(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.' [Citations omitted.]" *State v. Moyer*, 306 Kan. 342, 360, 410 P.3d 71 (2017).

Here, the aggravated robbery charges against Ross did not involve multiple acts simply because different items were taken from each victim. Each robbery occurred at or near the same time and in the same general location, with no intervening events or different impulses motivating each taking. In other words, the conduct underlying each aggravated robbery charge was unitary and did not require a unanimity instruction. This is not a multiple acts case with respect to the aggravated robbery charges.

In any event, even if this were a multiple acts case, any error in failing to give a unanimity instruction would not require reversal. "'Kansas appellate courts have held a "failure to instruct" in multiple acts cases to be reversible error except when the defendant presents a unified defense, *e.g.*, a general denial.'" *State v. De La Torre*, 300 Kan. 591, 599, 331 P.3d 815 (2014). Here, Ross' defense was that he was not present when the crimes allegedly occurred. Quite simply, he claimed he did not commit the alleged crimes, and he attacked the credibility of Jaye and R.C., who identified him as

being involved. Ross' defense did not depend on the jury believing that some of the items allegedly taken were not taken. Thus, even if Ross is correct in asserting that this is a multiple acts case, any error in failing to provide a unanimity instruction was harmless.

ARE TWO OF ROSS' AGGRAVATED ROBBERY CONVICTIONS MULTIPLICITOUS?

Ross also argues that his aggravated robbery convictions were multiplicitous, so he asserts that two of his three convictions should be vacated. Ross briefly argued multiplicity to the district court at the sentencing hearing, but as he concedes, he argued only that his aggravated kidnapping and aggravated battery convictions were multiplicitous, not his aggravated robbery convictions. But this fact alone does not prevent this court from now considering Ross' multiplicity arguments on appeal. As Ross contends, this court can "consider[] a multiplicity challenge for the first time on appeal in the interest of justice and to prevent a denial of fundamental rights." See *State v. Davis*, 306 Kan. 400, 420, 394 P.3d 817 (2017). "'Questions involving multiplicity are questions of law subject to unlimited appellate review.'" 306 Kan. at 419.

Multiplicity is "'the charging of a single offense in several counts of a complaint or information.'" *State v. Pribble*, 304 Kan. 824, 826, 375 P.3d 966 (2016). "'[T]he principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.'" 304 Kan. at 826.

> "'[T]he overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?' [Citation omitted.]" *State v. King*, 297 Kan. 955, 970, 305 P.3d 641 (2013).

28

As for the second step, our Supreme Court has instructed:

> "'If the double jeopardy issue arises because of convictions on multiple counts for violation of a single statute, the test is: How has the legislature defined the scope of conduct which will comprise one violation of the statute? Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution.'" *State v. Holman*, 295 Kan. 116, 148-49, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

Ross' separate aggravated robbery convictions are based on a violation of a single statute, so we apply the "unit of prosecution" test to determine whether the convictions were multiplicitous. K.S.A. 2017 Supp. 21-5420(a) defines robbery as "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 2017 Supp. 21-5420(b) defines aggravated robbery as robbery "committed by a person who: (1) Is armed with a dangerous weapon; or (2) inflicts bodily harm upon any person in the course of such robbery." Our Supreme Court has held:

> "Where, in the course of the robbery of a business establishment, several employees are held at gunpoint and compelled by force to deliver to the robber property in the possession or custody of the employee, a separate and distinct aggravated robbery occurs with the taking of property from each victim. . . . The forcible taking of such property from these employees constituted separate and distinct aggravated robberies which could be charged in separate counts." *State v. Shoemake*, 228 Kan. 572, 577, 618 P.2d 1201 (1980).

Here, during the course of a home invasion and robbery, Cameron, Jaye, and R.C. were held at gunpoint, individually threatened, and compelled by force to give the robbers property within their possession or custody. Based on *Shoemake*, three separate and distinct aggravated robberies occurred and Ross was properly charged, either as a

29

principal or an aider and abettor, with committing three separate aggravated robberies. Ross' aggravated robbery convictions are not multiplicitous.

## WAS THE EVIDENCE PRESENTED SUFFICIENT TO SUPPORT ROSS' AGGRAVATED BURGLARY CONVICTION?

Ross argues that this is an alternative means case as to the aggravated burglary charge and that the State failed to present sufficient evidence that Ross "entered into" or "remained within" the residence with the intent to commit rape. As a threshold matter, the State argues that the invited error doctrine prevents Ross from raising this claim.

The Kansas Supreme Court has yet to definitively answer "the question of whether alternative means error can never be invited." See *State v. Sasser*, 305 Kan. 1231, 1238, 391 P.3d 698 (2017). It has, however, found that a defendant's proposed jury instructions, *submitted pretrial*, are insufficient to trigger the invited error doctrine to bar a later alternative means claim because "defense counsel who formulates pretrial proposed jury instructions based on the charging document will not know whether the State's evidence will justify the instructions." 305 Kan. at 1238. Our Supreme Court has also held that the failure to object to a jury instruction does not trigger, in and of itself, the invited error doctrine with respect to a later alternative means claim. See *State v. Dern*, 303 Kan. 384, 395-98, 362 P.3d 566 (2015).

Here, Ross submitted his proposed jury instructions on April 5, 2017, during the State's presentation of its case-in-chief. The aggravated burglary instruction Ross submitted contained the language he now complains created the alternative means error. Moreover, after the informal off-the-record jury instruction conference, when the district court asked whether the parties had any objections to the aggravated burglary instruction the court intended to give, Ross stated: "No objection to 12. I'm requesting it." Thus, Ross affirmatively requested the jury instruction language of which he now complains; he

30

did so mid-trial, and he did so on the record at the close of the evidence. As the State argues, these facts present a strong case for application of the invited error doctrine to an alternative means claim. But because our Supreme Court has never addressed whether the facts presented in this case trigger the invited error rule, we will proceed to address the merits of Ross' claim.

Our Supreme Court has stated:

> "We have previously explained that when a single offense may be committed in more than one way, the jury must be unanimous as to the defendant's guilt. But unanimity is not required as to any individual means so long as substantial evidence supports each means. *State v. Brown*, 295 Kan. 181, 188, 284 P.3d 977 (2012). Alternative means issues arise when the statute and any instructions that incorporate it list distinct alternatives for a material element of the crime. *State v. Williams*, 303 Kan. 750, 757, 368 P.3d 1065 (2016). 'Consequently, determining whether a case involves alternative means is typically a matter of statutory construction, which is a question subject to unlimited review.' 303 Kan. at 757." *Sasser*, 305 Kan. at 1239.

"If this is an alternative means case, we must conduct what we have termed a 'super-sufficiency' analysis. That is, sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt." *State v. Butler*, 307 Kan. 831, 841, 416 P.3d 116 (2018).

K.S.A. 2015 Supp. 21-5807(b), defines aggravated burglary as:

> "without authority, entering into or remaining within any building, manufactured home, mobile home, tent or other structure, or any vehicle, aircraft, watercraft, railroad car or other means of conveyance of persons or property in which there is a human being with intent to commit a felony, theft or sexually motivated crime therein."

31

At trial, the district court instructed the jury on the aggravated burglary charge:

"To establish this charge, each of the following claims must be proved:
1. Jason Ross or another for whose conduct he is criminally responsible entered and/or remained in a residence.
2. Jason Ross or another for whose conduct he is criminally responsible did so without authority.
3. Jason Ross or another for whose conduct he is criminally responsible did so with the intent to commit an Aggravated Kidnapping and/or Aggravated Robbery and/or Aggravated Battery and/or Rape therein.
4. At the time there was a human being in the residence.
5. This act occurred on or about the 1st day of May, 2016 in Sedgwick County, Kansas."

Ross argues that entering into and remaining in a residence are alternative means. Our Supreme Court has agreed. See *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016) (stating that the phrases "entering into" and "remaining within" constitute alternative means of committing aggravated burglary). Ross also argues that the identified intended felonies (aggravated kidnapping, aggravated robbery, aggravated battery, and rape) also constitute alternative means of committing the crime. But the only alleged alternative means Ross specifically contends was not supported by sufficient evidence is that he "intended to aid and abet Bell to commit the rape."

The State asserts that "no Kansas case appears to have determined whether or not various felonies underlying a charge of aggravated burglary create alternative means" of committing the crime. However, we observe that in a 2014 case involving an aggravated burglary conviction, our Supreme Court noted, without engaging in any analysis, that "the information charging aggravated burglary contained three *alternative means* for committing the underlying felony: aggravated battery, aggravated assault, and/or murder

32

in the first degree." (Emphasis added.) See *State v. Brown*, 299 Kan. 1021, 1036, 327 P.3d 1002 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773.

We are duty bound to follow our Supreme Court's holding in *Daws* that the phrases "entering into" and "remaining within" constitute alternative means of committing aggravated burglary. See *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015) (Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position). Likewise, we will assume without deciding that whether Ross intended to commit each of the underlying crimes creates alternative means of committing aggravated burglary. Thus, based on Ross' arguments, we must decide if there was sufficient evidence presented at trial to support a finding that Ross entered into and remained within the residence with the intent to commit a rape.

> "When the defendant challenges the sufficiency of the evidence supporting a conviction, the standard of review is whether, after reviewing all the evidence in a light most favorable to the State, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In making such a determination, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. [Citation omitted.]" *Butler*, 307 Kan. at 844-45.

Ross argues that there was no evidence that he intended to aid and abet Bell in raping R.C. when he "entered into" the house. He also argues that evidence presented showed that he was outside the house when Bell allegedly raped R.C., and Ross asserts this evidence "certainly calls into question whether [Ross] had the specific intent to aid and abet Bell to commit a rape while [Ross] 'remained within' the residence."

The State asserts that Ross' arguments fail to view the evidence in the light most favorable to the State. The evidence shows that Ross had been in the house earlier in the evening, so he knew that R.C. was there. R.C. testified that when the two men entered the

33

basement, Ross immediately took her phone and car keys, preventing her from calling for help and hindering her ability to escape. Contrary to Jaye's testimony, R.C. testified that when Bell directed her, Jaye, and Cameron to remove their clothing, Ross was still in the basement, standing by the couch. R.C. also testified that Ross was in the room when Bell said he was going to rape her and leave her in a field. Bell told Jaye, "I'm going to rape your bitch," referring to R.C. Also, R.C. heard Bell "mak[e] mention of the Carr brothers," which she believed meant that she was about to be raped and killed.

"The element of intent necessary to establish and support criminal responsibility for aiding and abetting another to commit a crime may be inferred from circumstantial evidence." *State v. Edwards*, 209 Kan. 681, 685, 498 P.2d 48 (1972). Moreover, even when there is no direct evidence that a defendant specifically planned to aid or abet in a specific crime, a jury may consider the defendant's failure to oppose the commission of the crime under the circumstances at hand and thus conclude that the defendant assented to committing the crime and thus aided and abetted in it. *State v. Bland*, 33 Kan. App. 2d 412, 418, 103 P.3d 492 (2004), *rev. denied* 279 Kan. 1008 (2005).

Here, viewing all of the evidence in the light most favorable to the State, the jury could infer that Ross "entered into" the residence with the intent to aid and abet Bell to commit a rape. As stated, Ross and Bell knew that R.C. was in the residence before they entered because they had been there earlier in the evening. Moreover, Ross made no objection while Bell repeatedly indicated to R.C. and others that he intended to rape her, sufficient to provide an inference that Ross "remained within" the house with the intent to assent to the commission of the rape of R.C., thereby aiding and abetting in it. Ross' argument that some evidence showed that he was outside the house when Bell allegedly tried to rape R.C. misses the point. The State only needs to show that Ross remained within the house with the *intent* to aid Bell in committing the rape. Whether Ross was actually in the house when the sexual assault was committed does not matter.

34

In sum, the evidence presented at trial was sufficient to support a rational fact-finder finding Ross guilty beyond a reasonable doubt of entering into and remaining within the occupied residence without authority to do so and with the intent to aid and abet in the commission of the rape of R.C. Thus, even assuming that aggravated burglary is an alternative means crime in this instance, the sole alternative means Ross challenges on appeal was, in fact, supported by sufficient evidence.

## WAS THE EVIDENCE PRESENTED SUFFICIENT TO SUPPORT ROSS' AGGRAVATED KIDNAPPING CONVICTIONS?

Ross challenges the sufficiency of the evidence supporting his aggravated kidnapping convictions. Ross asserts separate arguments as to his convictions for aggravated kidnapping of Jaye and Cameron on the one hand and his conviction for aggravated kidnapping of R.C. on the other hand, and we will address each argument in turn.

*Aggravated kidnapping of R.C.*

The district court instructed the jury that to convict Ross of the aggravated kidnapping of R.C., it had to find the State proved: (1) "Ross or another for whose conduct he is criminally responsible took or confined [R.C.] by force or threat"; (2) they did so "with the intent to hold [R.C.] to facilitate the commission of a crime to wit: Aggravated Robbery and/or Aggravated Burglary and/or Rape"; (3) "[b]odily harm was inflicted upon [R.C.]"; and (4) "[t]his act occurred on or about the 1st day of May 2016, in Sedgwick County, Kansas."

Ross first argues that because the State failed to show sufficient evidence to support his guilt under all alternative means presented, this court must overturn his conviction on this count. In the alternative, Ross argues that his confinement of R.C. was

35

merely incidental to the commission of other crimes and, as such, cannot support an aggravated kidnapping conviction.

With respect to Ross' alternative means claim on this count, he asserts an argument similar to the argument he made for his aggravated burglary conviction, i.e., he asserts that each of the identified crimes he allegedly intended to facilitate through the kidnapping—aggravated robbery, aggravated burglary, and rape—constitute alternative means for committing aggravated kidnapping. Again, Ross only argues there was insufficient evidence that he took or confined R.C. with the intent to commit rape.

Ross' argument suffers from the same invited error problem we have previously discussed as to other charges. The language in the jury instruction of which Ross now complains was contained in the proposed jury instruction he submitted to the district court mid-trial. Moreover, when asked on the record if he objected to the giving of that instruction, Ross replied, "No objection. I'm requesting it, Judge." Again, we agree with the State that these facts present a strong case for application of the invited error doctrine on the alternative means claim, but we will address the merits of the claim anyway.

As with Ross' alternative means claim concerning his aggravated burglary conviction, there is some question whether Ross' intent to commit each of the underlying crimes creates alternative means of committing aggravated kidnapping. But we will assume without deciding that the aggravated kidnapping charge of R.C. presents an alternative means crime on this basis.

Ross argues there was insufficient evidence that Ross, either as a principal or an aider and abettor, took or confined R.C. with the intent to commit a rape. In rejecting this claim, the State points to much of the same evidence that supported Ross' conviction of aggravated burglary. The evidence shows that Ross had been in the house earlier in the evening, so he knew that R.C. was there. R.C. testified that when the two men entered the

36

basement, Ross immediately took her phone and car keys, preventing her from calling for help and hindering her ability to escape. She testified that when Bell directed her to remove her clothing, Ross was still in the basement, standing by the couch. R.C. also testified that Ross was in the room when Bell said he was going to rape her and leave her in a field. Bell told Jaye, "I'm going to rape your bitch," referring to R.C. Also, R.C. heard Bell "mak[e] mention of the Carr brothers," which she believed meant she was about to be raped and killed. Following that threat, Bell forced R.C. to go upstairs into the kitchen, where the two of them were alone. While pointing a gun at R.C., Bell reached out and rubbed her clitoris with his hand, inserting his finger past her labia.

A taking or confinement under the kidnapping statute requires no particular distance of removal, nor any particular time or place of confinement; it is the fact, not the distance, of the taking that supplies a necessary element of kidnapping. *State v. Burden*, 275 Kan. 934, 943, 69 P.3d 1120 (2003). We conclude there was sufficient evidence, viewed in the light most favorable to the State, to prove that Ross, as an aider and abettor, took or confined R.C. with the intent to commit a rape. Thus, even assuming that the aggravated kidnapping charge as to R.C. was an alternative means crime, the sole alternative means Ross challenges on appeal was supported by sufficient evidence.

In the alternative, Ross argues that his conviction for aggravated kidnapping of R.C. should be overturned because "her confinement was merely incidental to the aggravated robbery and rape and was insufficient to support a conviction of aggravated kidnapping." He bases his argument on our Supreme Court's holding in *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976). In *Buggs*, the Kansas Supreme Court held:

> "[I]f a taking or confinement is alleged to have been done to facilitate the commission of
> another crime, to be kidnapping the resulting movement or confinement:
> > (a) Must not be slight, inconsequential and merely incidental to the other crime;
> > (b) Must not be of the kind inherent in the nature of the other crime; and

37

(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

In *Buggs*, the victims were moved from a parking lot in public view to inside a store, which "substantially reduced the risk of detection not only of the robbery but the rape." 219 Kan. at 216. The *Buggs* court found that the movement satisfied the requirements of a "taking and confinement to 'facilitate' the commission of the robbery and rape." 219 Kan. at 217.

In *State v. Richmond*, 250 Kan. 375, 827 P.2d 743 (1992), the defendant was convicted of aggravated kidnapping, aggravated robbery, aggravated burglary, burglary, theft, battery, and two counts of rape. The evidence showed that the defendant entered the victim's living room and struck her with his fist, knocking her to the floor. The defendant then forced the victim to walk to her bedroom, picked her up, and threw her on the bed where he raped her. The defendant then walked the victim into her bathroom and back to the bed. He tied her hands and feet with nylon stockings he had removed from a dresser. The defendant then left the room for what seemed to the victim a long period of time while he took property from her residence. When he returned, the defendant untied the victim's feet and raped her again. 250 Kan. at 376.

Under these facts, our Supreme Court concluded there was sufficient evidence to support the aggravated kidnapping conviction. 250 Kan. at 376-78. The court found that the defendant's act of removing the victim from the living room to the bedroom was not slight, inconsequential, and merely incidental to the other crimes; instead, the movement helped facilitate both the rape and the aggravated robbery and lessened detection of the crimes by anyone arriving at the residence. 250 Kan. at 377-78. The court concluded: "We have no hesitancy in concluding the three-pronged test enunciated in *Buggs* has been satisfied herein and that this issue has no merit." 250 Kan. at 378.

38

On the other hand, in *State v. Ransom*, 239 Kan. 594, 601-03, 722 P.2d 540 (1986), decided 10 years after *Buggs*, the Kansas Supreme Court reversed an aggravated kidnapping conviction that was based upon the allegation that the defendant "took hold of [the victim's] hair and the back of her neck and walked her down the road," where he beat and raped her. 239 Kan. at 601. The *Ransom* court concluded that "[t]he 'walk' had no significance independent of the rape and did not make the rape substantially easier of commission," so it did not satisfy the *Buggs* test. 239 Kan. at 603.

In *State v. Crane*, 260 Kan. 208, 209-10, 918 P.2d 1256 (1996), the defendant physically lifted a video store employee off her feet and carried "her away from the door and window at the front of the store." Our Supreme Court noted that they did not go into the separate room, and the alleged movement "did not make the alleged offenses of attempted aggravated sodomy or attempted rape substantially easier" or "lessen the risk of detection since, at all times, [the victim] was not concealed from view." 260 Kan. at 234. The *Crane* court concluded that "[t]he movement was incidental to the commission of the alleged crimes," and it reversed the conviction for kidnapping. 260 Kan. at 234.

Ross asserts that taking R.C. up the stairs from the basement to the kitchen "did not facilitate the [a]ggravated [r]obbery because, by all accounts, the robbery was complete by this time." He also generally asserts that the movement of R.C. "did not make a rape substantially easier to commit." Ross notes that, like the victims in *Ransom* and *Crane*, the movement did not conceal R.C. from view, and he notes that moving R.C. to the kitchen may have increased her visibility, as the kitchen contained a sliding glass door and was closer to the front door.

In response, the State contends that moving R.C. to the upstairs kitchen facilitated the commission of rape because it removed her from the immediate vicinity of Jaye, who had initially physically resisted the attackers. The State also argues that moving R.C. to the upstairs kitchen facilitated the commission of the aggravated robbery because it

39

separated her from Jaye and Cameron, "decreasing the chance that either would resist the robbery just as one might expect when someone takes a hostage." In addition, the State posits that the isolation of R.C. allowed the perpetrators to leave Jaye and Cameron alone, trusting that Jaye and Cameron would be compliant out of fear for R.C.'s safety, and thus freeing up Ross to leave the basement and assist in the aggravated robbery.

The standard of review for a challenge to the sufficiency of evidence supporting a conviction requires this court to view the evidence in the light most favorable to the State. *Butler*, 307 Kan. at 844-45. Doing so, there was sufficient evidence to allow a rational jury to conclude that the movement of R.C. from the basement to the upstairs kitchen and the resulting separation of her from Jaye and Cameron lessened the threat that Jaye and/or Cameron would resist the perpetrators or otherwise come to R.C.'s defense, thereby facilitating the commission of a rape. Clearly, Bell wanted to be alone with R.C. before he sexually assaulted her. Likewise, Bell's removal of R.C. to an isolated part of the house assisted the other perpetrators in completing the aggravated robbery. In fact, witnesses testified that Ross removed substantial belongings from the residence during the time that Bell was confining R.C. in the upstairs kitchen.

Analyzing the three *Buggs* factors, we find that Ross' case is very similar to *Richmond* and distinguishable from *Ransom* and *Crane*. The movement of R.C. upstairs to the kitchen (1) was not "slight, inconsequential and merely incidental" to the crimes of aggravated robbery or rape; (2) was not "inherent in the nature of" aggravated robbery or rape; and (3) made the rape and aggravated robbery "substantially easier of commission" because it removed R.C. from the presence of Jaye and Cameron. The three-pronged test enunciated in *Buggs* has been satisfied, and Ross' argument that there was insufficient evidence to support his conviction of aggravated kidnapping of R.C. therefore fails.

*Aggravated kidnapping of Jaye and of Cameron*

The State charged Ross with aggravated kidnapping of Jaye and Cameron under a different subsection of the aggravated kidnapping statute than the charge with respect to R.C. The State charged Ross with kidnapping R.C. to facilitate flight or the commission of any crime, to wit: aggravated robbery, aggravated burglary, and/or rape. See K.S.A. 2015 Supp. 21-5408(a)(2). The State charged Ross with kidnapping Jaye and Cameron to inflict bodily injury or to terrorize the victim or another. See K.S.A. 2015 Supp. 21-5408(a)(3). So Ross' arguments with respect to the kidnapping of Jaye and Cameron are different from his arguments with respect to the kidnapping of R.C.

Ross again tries to challenge the sufficiency of the evidence to support his convictions by asserting an alternative means argument. Ross argues there was insufficient evidence that he "took or confined Jaye and Cameron for the purpose of inflicting serious bodily injury." He asserts that "taking" and "confining" are alternative means of committing the crime of aggravated kidnapping, and he argues there was insufficient evidence to constitute a "confinement" under the statute.

As the State points out, this argument has the same invited error problem as Ross' alternative means challenge to his aggravated burglary conviction. Ross submitted proposed jury instructions, mid-trial, that contained the language of which he now complains. Moreover, after the informal, off-the-record jury instruction conference, when the district court asked whether the parties had any objections to the instruction the court intended to give on the aggravated kidnapping of Jaye, Ross affirmatively stated: "No objections. We are requesting it, Judge." When the district court asked for objections to the instruction the court intended to give on the aggravated kidnapping of Cameron, Ross similarly responded: "No objection. I'm requesting it." We again agree with the State that these facts present a strong case for application of the invited error doctrine to Ross' alternative means claim, but we will address the merits of the claim anyway.

41

As to the aggravated kidnapping of Jaye, the district court instructed the jury that to find Ross guilty, the State must have proved: (1) "Ross or another for whose conduct he is criminally responsible took or confined [Jaye] by force or threat"; (2) they "did so with the intent to hold [Jaye] to inflict bodily injury on or to terrorize [Jaye], or another"; (3) "[b]odily harm was inflicted upon [Jaye]"; and (4) "[t]his act occurred on or about the first day of May 2016 in Sedgwick County, Kansas." The court gave the same instruction as to the aggravated kidnapping of Cameron, except for changing the victim's name.

Ross argues that "taking" and "confining" present alternative means of committing the crime of aggravated kidnapping of Jaye. To support his assertion, Ross cites to *State v. Haberlein*, 296 Kan. 195, 208, 290 P.3d 640 (2012), where the Kansas Supreme Court stated that the phrase "taking or confining" denotes two alternative means of committing kidnapping. But as the State points out, at least one opinion from this court has recognized that the statement in *Haberlein* that identified "taking or confining" as alternative means was mere dicta, as that issue was not before the *Haberlein* court. See *State v. Lloyd*, No. 113,486, 2016 WL 6568746, at *8 (Kan. App. 2016) (unpublished opinion) (Malone, C.J., concurring), *rev. denied* 306 Kan. 1326 (2017).

In any event, even if "taking" and "confining" are alternative means of committing aggravated kidnapping, Ross has limited his claim in several respects. First, Ross articulates argument only with respect to "confining"; he does not assert with any detail that there was insufficient evidence to show "taking." Second, the entirety of Ross' factual claim in his brief focuses on Jaye and not Cameron; he develops no separate argument as to the aggravated kidnapping of Cameron. Third, Ross only challenges the sufficiency of the evidence that he confined Jaye with the intent to inflict bodily injury on him; he does not challenge any of the evidence supporting the State's claim that Ross confined Jaye with the intent to terrorize him or another. The State's claims that Ross confined Jaye with the intent to inflict bodily injury on him or to terrorize him or another constitute options within a means of committing the crime, and the State only needs to

prove one of them. See *Haberlein*, 296 Kan. at 207. Ross has waived and abandoned any issues he has failed to brief. See *State v. Pewenofkit*, 307 Kan. 730, Syl. ¶ 2, 415 P.3d 398 (2018) (point raised incidentally in a brief and not argued is abandoned).

Ross argues there was insufficient evidence that he confined Jaye, even as an aider and abettor, with the intent to inflict serious bodily injury on him. Ross relies mainly on the fact that "Jaye was never moved from the basement. He was moved to different areas of the basement, but was never moved anywhere else in the residence." Ross cites *State v. Patterson*, 243 Kan. 262, 755 P.2d 551 (1986), to support his claim. In that case, a female victim voluntarily allowed the defendant and another man into her car to engage in sexual activity. There was no evidence that the woman was held in the car against her will. When the sex ended, the defendant held the woman down and the other man stabbed her. 243 Kan. at 265. Under those facts, our Supreme Court held there was "no evidence of any act of confinement of the victim as a separate act independent of the stabbing" to support a kidnapping charge. 243 Kan. at 265.

*Patterson* is clearly distinguishable from Ross' case. As the State points out, Jaye testified that two men, later identified as Bell and Ross, entered his basement together and held him against his will. Bell pulled Jaye off the couch, struck him in the back of his head with a gun, and threatened to kill him. After ordering Jaye to remove his clothes, Bell pulled Jaye from the living room floor and moved him into the bathroom. According to a diagram admitted into evidence at the trial, the bathroom was on the other side of the basement separated by a wall from the living room. In the bathroom, Bell told Jaye he was "going to shoot [his] dick off." Bell ordered Jaye into the shower, closed the shower door, leaned a bottle of lotion against it so that it would fall if the door was opened, and told Jaye that if he moved, Bell would come back and kill him.

Bell left the bathroom, but he returned after several minutes and took Jaye back into the basement living room. Bell told Jaye to look down the barrel of his gun and

asked Jaye if he could see the bullet; Jaye said yes. Bell then continued to strike Jaye and knocked him into the wall. Bell also retrieved a screwdriver from a table and threatened to "shove that up [Jaye's] ass." At that point, the other man—who Jaye later identified as Ross—approached him and said, "[D]o you know me, it's Lucky." According to Jaye, Ross stomped on his head "six or seven times." Then, either Ross or Bell piled furniture and other items on top of Jaye and told him that if he tried to move, the men would come back and kill him. The entire ordeal lasted about 45 minutes.

As stated earlier, a taking or confinement under the kidnapping statute requires no particular distance of removal or any particular time or place of confinement; it is the fact, not the distance, of the taking that supplies a necessary element of kidnapping. *Burden*, 275 Kan. at 943. When viewing the evidence in the light most favorable to the State, the evidence establishes that Ross, either as a principal or an aider and abettor, confined Jaye against his will with the intent to hold him to inflict bodily injury on him or to terrorize him. Thus, even assuming that aggravated kidnapping is an alternative means crime, there was sufficient evidence to support the charge.

Finally, Ross argues that "there was no real confinement apart from the acts of violence toward the victims and the acts of violence were part of the aggravated robbery." This argument is similar to the "*Buggs* test" argument Ross makes as to his conviction for aggravated kidnapping of R.C. But as Ross concedes in his brief, in *Burden*, 275 Kan. at 944-45, our Supreme Court held that the *Buggs* test is inapplicable to kidnapping charged under the "intent to inflict bodily injury" subsection of the statute. The *Buggs* test only applies to kidnapping committed "to facilitate flight or the commission of any crime," for which Ross was charged as to R.C. See 275 Kan. at 944-45.

In any event, as the crimes were charged, all the State needed to prove to convict Ross of aggravated robbery was that he took property from each of the victims while "armed with a dangerous weapon." As the State asserts in its brief, "[t]here was no need

44

to inflict bodily injury or to terrorize Cameron and Jaye for forty-five minutes in order to complete the aggravated robbery; rather, the injuries and terror inflicted were gratuitous and far beyond what was necessary." As a result, we find no merit to Ross' claim that there was insufficient evidence to support his convictions for aggravated kidnapping of Jaye and Cameron separate and apart from his aggravated robbery convictions.

## DOES PROSECUTORIAL ERROR REQUIRE A NEW TRIAL?

Ross contends that prosecutorial error denied him his constitutional right to a fair trial. Specifically, Ross points to (1) the introduction of State's Exhibit 83, the recording of the phone call in which Ross asked Russell to testify falsely as his alibi; (2) certain questions the State asked Ross during cross-examination; (3) the State's presentation of Naldoza as a rebuttal witness; and (4) comments made during closing argument.

The analytical structure for reviewing claims of prosecutorial error involves a two-step process: consideration of error and consideration of prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by [*Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* where there is no reasonable possibility that the error contributed to the verdict.' . . . [W]hen 'analyzing both constitutional and nonconstitutional error, an appellate court need only

address the higher standard of constitutional error.' [Citations omitted.]" *Sherman*, 305 Kan. at 109.

*State's Exhibit 83 and Naldoza's rebuttal testimony*

Ross argues that by introduction of State's Exhibit 83 and through evidence presented during Naldoza's testimony as a rebuttal witness for the State, the prosecutor violated a pretrial order in limine, violated K.S.A. 2017 Supp. 60-455, and violated K.S.A. 60-447. The State asserts that these evidentiary claims were not preserved for appellate review.

Our Supreme Court has held that even when characterized as prosecutorial error, evidentiary claims "must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). Our Supreme Court recently reaffirmed this holding, noting that *King* stands for the rule that "defendants cannot circumvent the contemporaneous objection requirements of K.S.A. 60-404 by characterizing the appellate issue as prosecutorial error, rather than an evidentiary error." *Lowery*, 308 Kan. at 1195.

Here, as Ross concedes, when the State moved to admit State's Exhibit 83 into evidence, defense counsel stated, "No objection." Similarly, Ross never objected during Naldoza's rebuttal testimony, and he affirmatively informed the district court that he had no objection to the introduction of State's Exhibit 84, the recordings of phone calls Ross made from the jail, which was introduced during Naldoza's rebuttal testimony. Thus, regardless of whether it is now characterized as a claim of prosecutorial error, Ross' claim that the introduction of State's Exhibit 83 or the introduction of evidence during Naldoza's rebuttal testimony was improper is not preserved for appellate review.

*Cross-examination of Ross*

During his direction examination, Ross admitted that he had called Russell from jail in an attempt to create a false alibi. On cross-examination, the State questioned Ross about his phone calls, which Ross acknowledged he had made under other inmates' PIN numbers to try to hide who he was calling. At one point, the prosecutor asked: "When we talk about the other things that you have asked people to do for you besides get on the stand and lie, would that include trying to find the witnesses in the case and scare them away from testifying, yes or no?" Defense counsel objected to this specific question and a sidebar conference occurred out of the hearing of the jury. After a lengthy conference, the prosecutor agreed to limit the scope of his questioning on the subject. The prosecutor resumed his cross-examination of Ross without any further objections on the subject.

Ross now argues that the prosecutor's entire line of questioning violated an order in limine and K.S.A. 2017 Supp. 60-455. But the only objection defense counsel made at trial was resolved at the bench conference. Ross did not request a continuing objection, nor did he object during the subsequent cross-examination on the grounds he now asserts. Under these facts, we find that Ross has not preserved this claim for appeal. As stated, even when characterized as prosecutorial error, evidentiary claims must be preserved by a contemporaneous objection to be reviewed on appeal. *King*, 288 Kan. at 349.

*Closing argument*

Finally, Ross identifies several comments made by the State in closing argument that he asserts were prosecutorial error. Although Ross did not contemporaneously object to these statements, his claim is still properly before this court. See *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015) (prosecutorial error based on comments during closing arguments is reviewable absent a contemporaneous objection).

It is well-established in Kansas that a prosecutor cannot state a personal opinion in closing argument on the credibility of a witness. *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000). Likewise, it is improper for the prosecutor to misstate the law or the evidence to the jury. *State v. Hall*, 292 Kan. 841, 846, 257 P.3d 272 (2011).

Ross identifies three comments as prosecutorial error. First, during its initial closing argument, the prosecutor made this statement referring to Ross' testimony: "And then the T-shirt with his DNA in the head, right here, around your neck. *He makes up* or he indicates to you that he wiped his mouth when he was coughing earlier and just used this shirt to wipe his mouth, but his DNA is there at the scene." (Emphasis added.) Ross now objects to the prosecutor's language that Ross "made up" part of his testimony. He also contends that this same comment misstated the evidence presented, since Ross had actually testified that he wiped his mouth off on a towel on Jaye's bed, not a t-shirt. We agree with Ross that this comment was prosecutorial error to the extent that it misstated the evidence and implied that Ross was testifying falsely.

Second, Ross challenges the following statement that occurred during the rebuttal portion of the State's closing argument: "The only person who took the stand that there's evidence was trying to manipulate the jury was this defendant. What motive do they [the victims] have? Oh, right, none. You weren't given any evidence of that." Although a closer call, we agree that the prosecutor's reference that Ross was "trying to manipulate the jury" was improper and amounted to error.

Third, Ross claims the prosecutor misstated the law when she told the jury that it could convict Ross of aggravated battery of Cameron if it found there was bodily harm. We disagree. The prosecutor correctly stated the law by informing the jury that it could find Ross guilty of aggravated battery if it found that he caused bodily harm to Cameron in any manner whereby great bodily harm, disfigurement, or death could be inflicted; but that Ross was guilty of the lesser charge of battery if the jury found only bodily harm.

48

Turning to the prejudice prong, we conclude beyond a reasonable doubt that any prosecutorial error did not affect the outcome of the trial in light of the entire record. The prosecutor made two isolated comments about Ross' testimony that were improper. But the State presented substantial evidence at trial undermining Ross' credibility, so the prosecutor's comments likely would not have affected the jury. Ross admitted that he called Russell from jail in an attempt to create a false alibi. He also admitted making jail phone calls under other inmates' PIN numbers. Ross also admitted: (1) he had asked Niko to falsify an alibi for him and to ask a woman named Kelsey to do the same; (2) he asked McDowell and another friend, Anthony, to testify falsely on his behalf; (3) he asked his mother to find someone to say that Taylor was being paid to falsely identify him; (4) he called Dominique Shugart to make a three-way phone call with Anthony to further a story that Taylor was a habitual liar; and (5) in another phone call to his mother, he referred to clothing taken from the residence on the night of the robberies and asked his mother to tell his brother to say they had purchased the clothing together in Dallas.

Finally, the State's evidence against Ross overwhelmingly proved his guilt. Ross was positively identified as one of the perpetrators by Jaye, R.C., and Taylor, the neighbor, who had a face-to-face conversation with Ross as he was removing property from the residence. Ross was identified on Facebook wearing a beanie that he left at the residence on the night in question. In another Facebook photo of Ross, Jaye saw what he believed was some of his clothing taken on the night in question. Finally, some DNA evidence tied Ross to the scene of the crime. We find that any improper comments made by the prosecutor during closing argument did not affect the outcome of the trial in light of the entire record and were harmless beyond a reasonable doubt.

### DID CUMULATIVE ERROR DENY ROSS A FAIR TRIAL?

Finally, Ross argues briefly that the cumulative effect of the errors he asserted deprived him of his right to a fair trial. The State disagrees, arguing that any errors that

occurred were harmless, they did not cause an aggregation of prejudice, and they should not undermine confidence in Ross' convictions.

> "'When faced with a cumulative error claim, this court conducts an unlimited review of the entire record to determine whether the totality of the circumstances establishes that the cumulative effect of trial errors substantially prejudiced the defendant and denied the defendant a fair trial.' However, 'if any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.'" *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017).

The only error we have identified in this opinion is the prosecutorial error during closing argument. Also, we found that the testimony by SANE nurse Hess about penetration was harmless, if that issue was even preserved. As already set forth in the analysis of those errors, they are harmless beyond a reasonable doubt collectively as well as individually. Any errors identified during Ross' trial do not support reversal under a cumulative error analysis. A defendant is entitled to a fair trial but not a perfect one. *State v. Lumley*, 266 Kan. 939, 962, 976 P.2d 486 (1999). Ross received a fair trial.

Affirmed.

\* \* \*

ATCHESON, J., concurring: I concur in the result the majority reaches in affirming Defendant Jason Todd Ross' convictions. Given the district court record, Ross has been unable to marshal an argument warranting relief on any of the grounds he has raised on appeal.